BARBARA R. MONDELLI, APPELLANT AND CROSS-APPELLEE, V.
KENDEL HOMES CORPORATION, A NEBRASKA CORPORATION,
AND CITY OF PAPILLION, NEBRASKA, A POLITICAL SUBDIVISION OF
THE STATE OF NEBRASKA, APPELLEES AND CROSS-APPELLANTS.
VITO B. MONDELLI, APPELLANT AND CROSS-APPELLEE, V.
KENDEL HOMES CORPORATION, A NEBRASKA CORPORATION,
AND CITY OF PAPILLION, NEBRASKA, A POLITICAL SUBDIVISION OF
THE STATE OF NEBRASKA, APPELLEES AND CROSS-APPELLANTS.

631 N.W.2d 846

Filed July 20, 2001.   Nos. S-00-296, S-00-297.

W. Craig Howell and Nora M. Kane, of Domina Law, P.C., for appellants.

Richard C. Gordon and Betty L. Egan, of Walentine, O'Toole, McQuillan & Gordon, for appellee Kendel Homes Corp.

Thomas M. Locher and Thomas M. Braddy, of Locher, Cellilli, Pavelka & Dostal, L.L.C., for appellee City of Papillion.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

WRIGHT, J.

## I. NATURE OF CASE

Barbara R. Mondelli and Vito B. Mondelli (Mondellis), individually and on behalf of their children, Jacqueline and Anthony, sought to recover damages for personal injuries allegedly sustained as a result of the defective construction of their home in Papillion, Nebraska. The district court granted partial summary judgment for the City of Papillion (City) based

on the court's finding that the City did not owe an actionable duty to the Mondellis.

In an earlier appeal, this court determined that genuine issues of material fact existed as to whether the City breached a legal duty owed to the Mondellis. The judgment of the district court was reversed, and the cause was remanded for further proceedings. See *Mondelli v. Kendel Homes Corp.*, 254 Neb. xvii (case Nos. S-96-820 through S-96-823, Apr. 1, 1998).

Upon remand, the parties bifurcated liability and damages. The district court found liability on the part of the City and Kendel Homes Corporation (Kendel), but the court granted the defendants' motion for directed verdict on causation and damages.

## II. SCOPE OF REVIEW

■ A trial court's ruling in receiving or excluding an expert's testimony which is otherwise relevant will be reversed only when there has been an abuse of discretion. *Nebraska Nutrients v. Shepherd*, 261 Neb. 723, 626 N.W.2d 472 (2001).

■ A trial court should direct a verdict as a matter of law only when the facts are conceded, undisputed, or such that reasonable minds can draw but one conclusion therefrom. *Id.*

## III. FACTS

In 1991, the Mondellis entered into a purchase agreement with Kendel for a house to be built in Papillion. During construction, the house was inspected by the City building inspector to determine whether it conformed with the requirements of Papillion's municipal code (Code) and the Uniform Building Code (UBC), which had been incorporated into the Code by the Papillion City Council. The Mondellis and their children moved into the house in April 1992.

Subsequently, Barbara noticed water coming into the basement beneath the dining room window and the formal living room window. Kendel put caulking on the windowsills, but each time it rained between May 1992 and July 1993, the Mondellis noticed water in the basement of the house. Kendel was asked to do some curative work on the brick front of the house, but no action was taken until May 1993, when a bricklayer did some random cutting and retucking.

At about the same time, a Kendel employee cut a 6- by 1-foot section of Sheetrock in both the dining room and Jacqueline's bedroom upstairs. When the employee pulled out the insulation, it was dripping and had an odor. Barbara noticed that the stud plate and the wall were covered with mud and tiny toadstools. The employee told Barbara that the problem was mold and suggested that she hire an attorney.

Barbara testified that she began noticing a strange odor in the home in the summer of 1992 but thought the odor was the smell of a new house. Over time, the odor worsened, and Jacqueline complained that her room smelled funny and that she could not breathe at night.

The Mondellis alleged that surface water and rainwater leaked through the exterior of the house into the interior and that mold, fungi, and airborne spores began growing in the exterior wall insulation and interstitial spaces between the interior and exterior walls of the house. The Mondellis claimed that in June 1993, they learned that mold, fungi, and spores had circulated throughout the house and affected the air, carpeting, furniture, clothing, and personal effects, which made them unusable.

The Mondellis claimed that the mold caused health problems. Starting in November 1992, Barbara began having headaches and nasal congestion. By February 1993, she was short of breath, had developed an annoying cough, and felt pressure on her chest. She sought medical attention in July for her complaints, and the family moved out of the house on the doctor's recommendation. Dr. Manju Patney diagnosed Barbara as suffering from asthma. She suffered several asthmatic attacks that required hospitalization. Dr. Patney stated that mold was a common cause of asthma and that Barbara's asthma was triggered by exposure to high counts of mold in the house.

In their fourth amended petitions, the Mondellis alleged that the City inadequately and negligently inspected the house in a manner constituting a reckless disregard for public health and safety. The Mondellis alleged that the City issued a building permit to Kendel when the blueprints and construction design for the house were in violation of the Code, the UBC, and industry standards. They claimed that the City approved the construction notwithstanding reasonable notice of the existence of the defects.

As to Kendel, the Mondellis alleged that the house had latent and dangerous defects. They claimed that the exterior walls were not properly weatherproofed as a result of Kendel's failure to install water-resistant sheathing between the brick facade and the interior walls of the house, in violation of §§ 1708 and 3006 of the UBC, as adopted by the Code, and industry standards. They further claimed that flashing where the roof line and the garage joined the northeast exterior of the wall of the house was not properly installed; that weep holes between the first course of the brick and the concrete block foundation wall on the north side of the house were not properly installed; that mortar was not properly applied to the bed and head joints of the brick on the north facade of the house; and that mortar work on the brick was improperly done in temperature conditions below generally accepted temperature levels for such work, in violation of the Code, the UBC, and industry standards.

The Mondellis alleged that in connection with the construction and sale of the house, Kendel impliedly warranted that the house would be erected in a workmanlike manner in accordance with good usage and accepted practices in Papillion and similar communities; would be constructed in accordance with the Code, the UBC, and industry standards; and would be fit for its intended purposes free from latent defects and fit for human habitation. The Mondellis' theory of relief also alleged strict liability and negligence.

At the end of the liability phase of the trial, the district court found that the Mondellis had met their burden of proof that the house was defective in that (1) the exterior walls of the house were not properly weatherproofed as a result of Kendel's failure to install water-resistant sheathing, (2) the flashing was not properly installed, (3) the weep holes were not properly installed, and (4) the mortar was not properly applied. The district court found that all these actions were in violation of the Code and industry standards and that these defects constituted a breach of implied warranty that the house would be erected in a workmanlike manner. The district court concluded that the Mondellis failed to prove that the defects constituted a breach of warranty that the house would be fit for human habitation.

On the theory of negligence, the district court found that Kendel was negligent in constructing the house in violation of the Code, the UBC, and industry standards; in failing to supervise and inspect the construction and the work of its subcontractors to ensure that the house was free of defects; and in failing to adequately instruct its subcontractors on the Code, the UBC, and industry standards. The district court entered judgment in favor of the Mondellis against Kendel on liability under the theories of implied warranty and negligence and stated that strict liability was an appropriate theory of recovery. However, the district court reserved for further hearing the issue of whether the defects rendered the home unreasonably dangerous and unsafe for its intended use.

The district court found the City negligent in issuing a building permit when the blueprints and construction design for the house violated the Code, the UBC, and industry standards and in approving construction of the house notwithstanding reasonable notice of the existence of the defects and found that the City acted in reckless disregard for public health and safety. The district court entered judgment on the issue of liability against the City, reserving for further hearing as to both Kendel and the City the issue of damages proximately caused and resulting from the respective breaches of implied warranty, negligence, and/or strict liability.

At the time of trial on causation and damages, the district court denied the Mondellis' motion to join their claims with those of their children based on commonality of facts and witnesses. During the trial, the district court excluded the testimony of the Mondellis' expert witness, Dr. Adi Pour, a toxicologist for the Nebraska Department of Health and Human Services Regulation and Licensure. The district court found that Dr. Pour could not testify as to causation because no standards existed in the scientific community concerning the level of mold which is acceptable in a house. The district court also excluded some of the testimony of Dr. Jerome King, a quality control director for Midwest Laboratories, Inc., and a report prepared by Midwest Laboratories because the court found that the laboratory's sampling procedure was flawed and lacked foundation. At the close of the evidence, the district court

granted the defendants' motion for a directed verdict on the grounds that causation had not been proved. The Mondellis' motion for new trial was subsequently overruled, and they appeal. Kendel and the City have each cross-appealed.

## IV. ASSIGNMENTS OF ERROR

The Mondellis assign the following errors: (1) The district court erred in excluding the testimony of Dr. Pour; (2) the district court erred in excluding the testimony of Dr. King concerning the findings of Midwest Laboratories and the findings, conclusions, and opinions derived from research performed by Midwest Laboratories; (3) the district court erred in sustaining the motion for directed verdict of Kendel and the City; and (4) the district court erred in refusing to join the claims of the Mondellis and their children and, in doing so, abused its discretion by removing the children's properly pled claims for relief as minors from Barbara's lawsuit.

The City's cross-appeal claims that the district court erred (1) in stating and applying the law of the case; (2) in finding that the Code incorporated by reference the 1983 edition of the "One and Two Family Dwelling Code" (CABO); (3) in finding that the Code required builders to install tar paper over the sheathing that covers the frame before constructing the exterior brick veneer of a house; (4) in finding that the City had a duty to inspect building plans and construction for compliance with industry standards; (5) in finding that the Mondellis met their burden of proof that the City issued a building permit when the blueprints and construction design for the house were in violation of the Code, the UBC, and industry standards; (6) in finding that the Mondellis met their burden of proof that the City approved construction of the house notwithstanding reasonable notice of the existence of the defects; (7) in finding that the Mondellis met their burden of proof that the negligent acts of the City occurring after February 7, 1992, constituted a reckless disregard for public health and safety; and (8) in failing to find that the City was immune from suit under Neb. Rev. Stat. § 13-910(1), (2), and/or (3) (Cum. Supp. 1992).

In its cross-appeal, Kendel assigns as error: (1) The district court erred in finding that the theory of strict liability applies to

this case and in imposing liability on Kendel on that basis; (2) the district court erred in finding that the CABO applied and that the CABO imposed construction obligations on Kendel and/or that Kendel failed to satisfy those obligations or their equivalents; and (3) the district court erred in finding that the evidence sustained the imposition of liability on Kendel on the basis of breach of warranty, strict liability, and/or negligence.

## V. ANALYSIS

### 1. MONDELLIS' APPEAL

### (a) Exclusion of Testimony

We first address the Mondellis' claim that the district court erred in excluding the testimony of Drs. Pour and King.

#### (i) Dr. Pour

The district court granted the City's motion in limine as to Dr. Pour, finding that there were no standards shown for sampling of the level of spores or mold and any related hazard or danger. The district court found that there were no accepted standards on "environmental [air] in residences" and that Dr. Pour's testimony would not have general acceptance in the scientific community under the *Frye* standard. See *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).

■ A trial court's ruling in receiving or excluding an expert's testimony which is otherwise relevant will be reversed only when there has been an abuse of discretion. *Nebraska Nutrients v. Shepherd*, 261 Neb. 723, 626 N.W.2d 472 (2001). Four factors govern the admissibility of expert testimony: (1) whether the witness is qualified as an expert, (2) whether the testimony is relevant, (3) whether the testimony will assist the trier of fact, and (4) whether the probative value of the testimony, even if relevant, is outweighed by the danger of unfair prejudice or other considerations. *Id.* At the time of trial, Nebraska adhered to the *Frye* standard, under which the proponent of evidence must prove general acceptance by surveying scientific publications, judicial decisions, or practical applications, or by presenting testimony from scientists as to the attitudes of their fellow scientists. *Sheridan v. Catering Mgmt., Inc.*, 252 Neb. 825, 566 N.W.2d 110 (1997). But see *Schafersman v. Agland Coop, ante*

p. 215, 631 N.W.2d 862 (2001). The district court refused to allow Dr. Pour's testimony to be presented to the jury.

Dr. Pour is an environmental toxicologist. She received a bachelor's degree in biology from the University of Nebraska at Omaha, a master's degree in pharmacodynamics and toxicology from the University of Nebraska Medical Center (UNMC), and a Ph.D. in toxicology from UNMC. As a toxicologist for the Department of Health and Human Services Regulation and Licensure, she addresses any cases related to toxicology of water, consumer risks, and other environmental issues.

Dr. Pour stated in her deposition that there are no state regulations concerning indoor air quality. The state does not recommend that air samples be taken for mold. She testified that if there are visible signs of mold, there is no need for air monitoring. Although Dr. Pour did not visit the Mondelli home, she stated that she has inspected 10 homes which had mold. When investigating for microbiological contamination, Dr. Pour said the most important factor is visual inspection. Also taken into consideration are the symptoms of persons living in the home and the history of the home. She had seen photographs of the Mondelli home but did not rely on them to form her opinion.

On December 9, 1993, Dr. Pour wrote a letter to the Mondellis recommending that they not return to the home until the mold problem had been resolved. She made the recommendation on the basis of a laboratory report about the air quality of the home and medical reports on the Mondellis.

Dr. Pour stated that no industry standards exist to determine the acceptable level of mold in an indoor area; only guidelines or recommendations are available. The indoor air quality concentration for total mold should be 25 percent of the outside concentration during the summer. According to Dr. Pour, a house with less than 100 colony-forming units per cubic meter of total molds is a house with no mold problem. Dr. Pour said she based her opinion on general scientific information.

The laboratory report on the Mondelli home indicated readings for the mold level in Jacqueline's bedroom ranging from 550 spores per cubic meter of total molds in the middle of the bedroom to 725 spores per cubic meter. Under the plastic in the bedroom, which had been placed over the hole cut by the Kendel

employee, the total mold count was 950 spores per cubic meter, and in the dining room, under the plastic, the total mold count was 1,675 spores per cubic meter. The reading for the front porch was 625 spores per cubic meter, while the southeast property line reading indicated 100 spores per cubic meter. The report identified several types of mold, including "Aspergillus ochraceous," "Aspergillus sp. (other)," "Penicillium viridicatum," "Aspergillus flavus," and "Verticillium."

Dr. Pour stated that there is a potential hazard if different types of mold are found outdoors from those found indoors. The laboratory report on the Mondelli home showed different species of mold in the air monitoring data, which Dr. Pour said was a significant finding.

Based on peer review of scientific literature, Dr. Pour stated that molds are a cause of asthma and allergic rhinitis. She stated that the literature also supported her opinion that prolonged contact with or repeated exposure to mold may result in permanent lung damage and that the literature supports her finding that mold levels in the Mondelli house were far above mold levels found in clinical studies around the country.

Dr. Pour provided a list of publications that she has read which she said "add to [her] knowledge on the risk of fungi and human health." She stated that these articles included "Managing Allergy in the Asthma Patient," "The Impact of Allergy and Immunology on our Expanding Industrial Environment," "Building-Related Asthma in Denver Office Workers," "Environmental Control of Indoor Biologic Agents," and "Building-Related Factors to Consider in Indoor Air Quality Evaluations," all from the Journal of Allergy and Clinical Immunology and the American Journal of Public Health. In refusing to allow Dr. Pour to testify, the district court determined that there had been no peer review of publications.

We first compare the evidence regarding Dr. Pour's testimony to the four factors used to determine whether her testimony is admissible as expert testimony. See *Nebraska Nutrients v. Shepherd*, 261 Neb. 723, 626 N.W.2d 472 (2001). First, the district court itself noted that Dr. Pour had the qualifications of an expert witness. Second, her testimony was relevant to the issue of damages after liability had been determined by the district

court. Third, the testimony concerning the relationship between mold and health concerns would have assisted the jury in understanding the evidence. Fourth, the testimony's probative value outweighed the danger of unfair prejudice. To satisfy the *Frye* standard, Dr. Pour showed that the issue of mold as it relates to health concerns has been addressed in scientific publications. See *Sheridan v. Catering Mgmt., Inc.*, 252 Neb. 825, 566 N.W.2d 110 (1997). We conclude that Dr. Pour's testimony satisfies the four considerations for admission of expert testimony.

■ The facts or data upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the trial. If the data is of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. See *Terry v. Duff*, 246 Neb. 524, 519 N.W.2d 550 (1994). Dr. Pour should have been allowed to present her opinion as to the meaning of the Midwest Laboratories' report, regardless of whether the report itself was admitted. The jury should have been allowed to weigh the credibility of the testimony. See *Norman v. Ogallala Pub. Sch. Dist.*, 259 Neb. 184, 609 N.W.2d 338 (2000).

■ Where the rules of evidence apply, the admissibility of an expert's testimony, including an opinion, which is based on a scientific principle or on a technique or process which utilizes or applies a scientific principle, depends on general acceptance of the principle, technique, or process in the relevant scientific community. *Sheridan v. Catering Mgmt., Inc., supra.* Dr. Pour testified that there is no established standard to determine the acceptable level of mold. The list of publications which have addressed the presence of microbiological organisms and their relationship to asthma and allergies showed that the scientific community has generally accepted the principle that a connection exists between the presence of mold and health.

■ Expert testimony should not be received if it appears that the witness is not in possession of such facts as will enable the expert to express a reasonably accurate conclusion, and where the opinion is based on facts shown not to be true, the opinion lacks probative value. *Nebraska Nutrients v. Shepherd, supra.* Dr. Pour has a background in toxicology and biology and has studied numerous publications concerning allergies and

immunology. She also reviewed the test data on the Mondelli home. Her opinion was probative on the issue of causation.

■ A trial court's ruling in receiving or excluding an expert's testimony which is otherwise relevant will be reversed only when there has been an abuse of discretion. *Nebraska Nutrients v. Shepherd, supra.* A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrain from acting, but the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system. *Noonan v. Noonan,* 261 Neb. 552, 624 N.W.2d 314 (2001). We conclude that the district court abused its discretion in refusing to allow Dr. Pour to testify at trial and that the Mondellis were deprived of the right to present their case to the jury when the district court refused to allow Dr. Pour to testify.

### (ii) Dr. King

Dr. King, a quality control director at Midwest Laboratories, has a bachelor's degree in biology, a master's degree in zoology, and a Ph.D. in biology with an emphasis on human physiology. Dr. King testified that he has 10 years' experience in air sampling, including the analysis and interpretation of results from air samples.

Dr. King explained that air samples from the Mondelli home were collected using a standard protocol which involved the use of a "Biotest Air Sampler." The Biotest Air Sampler draws a volume of air through the instrument, and a set of impellers forces spores or other organisms into an agar plate. After the sampler is allowed to run for a certain period of time, the agar strip is removed and the number of organisms counted. Dr. King testified that in his opinion, the sampler is reliable. The protocol requires calibration of the instrument, and the samples of the Mondelli home were taken in the "breathing zone of the individual" to measure the air normally inhaled. The breathing zone is approximately 1 foot below the mouth to 1 foot above the mouth. Dr. King said that the protocol meets industry standards.

During a discussion outside the presence of the jury, the district court indicated that it had a problem with Dr. King's testi-

mony because he was testifying prior to the testimony of the individuals who had collected the samples from the Mondelli home. The district court was concerned because the air samples relied upon were "taken in an interstitial space under plastic" rather than in the breathing zone described by Dr. King. The Mondellis argue that the district court made a determination on its own, without cross-examination or any scientific support, that mold in the interstitial space could not be tested through an air sampler.

The district court thereafter sustained numerous foundational objections to questions asked of Dr. King, who testified that the Biotest Air Sampler was accurate because the publications he had received from the manufacturer indicated an error rate of plus or minus 2 percent. Dr. King also testified that he had not referred to publications that were subject to peer review concerning the accuracy of the Biotest Air Sampler. Following that statement, an objection to Dr. King's testimony was sustained based on foundation. The district court also sustained the defendants' motion to strike Dr. King's testimony concerning the accuracy and purported reliability of the Biotest Air Sampler.

When the Mondellis attempted to ask questions concerning the error rate of the laboratory methodologies, relevancy objections were sustained. An analytical report prepared by Dr. King concerning the Mondelli home was offered as a business record exception to the hearsay rule. The defendants' objections based on foundation and hearsay were sustained because the district court found that the sampling was "so flawed" that any opinion expressed on the sampling would not "pass either . . . the Frye or the Daubert standards."

The district court refused to admit Midwest Laboratories' report as a business record because it contained opinions upon which any foundational basis was lacking. Dr. King testified that he had analyzed the laboratory results, but he was not allowed to offer his conclusions.

The Mondellis' offer of proof stated that if Dr. King were allowed to testify, he would have stated that there was a proliferation of molds in the interstitial spaces of the Mondelli home, that there was an amplification of molds in the home, and that there was a confluent growth of mold in the home greater than growth in the outside environment.

With regard to the factors set forth in *Nebraska Nutrients v. Shepherd*, 261 Neb. 723, 626 N.W.2d 472 (2001), to determine the admissibility of an expert's testimony, we conclude that the factors were satisfied as to Dr. King. He was qualified to testify as an expert witness. His testimony explaining the results of the air sampling in the Mondelli home was relevant to the issue of damages. His explanation would have assisted the jury in understanding the evidence, and the danger of unfair prejudice did not outweigh the probative value of the testimony.

As noted earlier, if data relied upon by an expert is of a type reasonably relied upon by experts in a particular field in forming opinions or inferences, the facts or data need not be admissible in evidence. See *Terry v. Duff*, 246 Neb. 524, 519 N.W.2d 550 (1994). We conclude that Dr. King should have been allowed to give an opinion regarding the test results, and the jury should have been allowed to weigh the credibility of the information. See *Norman v. Ogallala Pub. Sch. Dist.*, 259 Neb. 184, 609 N.W.2d 338 (2000). The district court abused its discretion in not allowing Dr. King to state his opinion. This deprived the Mondellis of the right to present their entire case to the jury.

### (b) Directed Verdict

The Mondellis assert that the district court erred in sustaining the motion for directed verdict by Kendel and the City. A directed verdict is proper at the close of all the evidence only where reasonable minds cannot differ and can draw but one conclusion from the evidence, that is to say, where an issue should be decided as a matter of law. *Austin v. State Farm Mut. Auto. Ins. Co.*, 261 Neb. 697, 625 N.W.2d 213 (2001).

The issue of whether the district court should have directed a verdict is tied to the court's error in excluding the testimony of Drs. Pour and King. Had such testimony been admitted, the record would have contained evidence about which reasonable minds could differ, which would preclude the entry of a directed verdict against the Mondellis. See *Rod Rehm, P.C. v. Tamarack Amer.*, 261 Neb. 520, 623 N.W.2d 690 (2001).

### (c) Motion for Joinder

The Mondellis assert that the district court erred in refusing to join their claims with those of their children and abused its

discretion in removing the children's claims for relief as minors from Barbara's lawsuit.

State law provides:

> All persons *may* join in one action as plaintiffs if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and *if any question of law or fact common to all these persons will arise in the action.*

(Emphasis supplied.) Neb. Rev. Stat. § 25-311 (Cum. Supp. 2000).

Joinder is discretionary under § 25-311. In this case, the facts concerning health problems and the amount of damages are different for each plaintiff. We conclude that the district court did not abuse its discretion in refusing to join all of the claims into one action.

### (d) Admission of Exhibits

■ The Mondellis argue but do not assign as error that the district court erred in refusing to admit exhibits 81 and 89 based on the business records exception to the hearsay rule. We decline to consider this argument. In order to be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error. *Nelson v. Lusterstone Surfacing Co.*, 258 Neb. 678, 605 N.W.2d 136 (2000).

### 2. City's Cross-Appeal

■ We next address the City's cross-appeal. The City alleges that the district court erred in stating and applying the law of the case with regard to certain facts discussed in our earlier memorandum opinion. See *Mondelli v. Kendel Homes Corp.*, 254 Neb. xvii (cases Nos. S-96-820 through S-96-823, Apr. 1, 1998). In its order on remand, the district court stated that although the court did not believe it critical to the outcome of the case, it accepted the following "propositions of law" from the memorandum opinion of this court as constituting the law of the case:

> (1) Defendant City of Papillion incorporated the 1985 edition of the Uniform Building Code (UBC) by reference in §9-401 of the Code;

(2) §1202 of the UBC adopted the 1983 edition of the One and Two Family Dwelling Code (CABO Code);

(3) §1707(a) of the UBC and §R503.1 of the CABO Code require builders to install tar paper over the sheathing that covers the frame before constructing the exterior brick veneer of a house;

(4) Defendant City of Papillion, through its employees, had a duty to exercise reasonable care in reviewing plans and specifications for the Mondellis' home and inspecting it during construction for compliance with Papillion's building code.

"Under the law-of-the-case doctrine, the holdings of the appellate court on questions presented to it in reviewing proceedings of the trial court become the law of the case; those holdings conclusively settle, for purposes of that litigation, all matters ruled upon, either expressly or by necessary implication." *Hoiengs v. County of Adams*, 254 Neb. 64, 69, 574 N.W.2d 498, 502 (1998).

■ When this matter was first presented to this court, it came as an appeal from a summary judgment granted in favor of the City. Kendel did not actively participate in that appeal, and amended pleadings were filed after the cause was remanded. On a motion for summary judgment, the question is not how a factual issue is to be decided, but whether any real issue of material fact exists. *Morrison Enters. v. Aetna Cas. & Surety Co.*, 260 Neb. 634, 619 N.W.2d 432 (2000). On review of a summary judgment, this court does not determine how factual issues should be decided. We consider only whether there is a real issue of material fact that exists. We were not asked to, and did not, determine the liability of any party. The "facts" outlined in the memorandum opinion were based on viewing the evidence which had been presented at that time in the light most favorable to the Mondellis and were not the law of the case. Thus, the district court erred in accepting those facts as such.

■ We next consider the question of the City's immunity. The City argues that the district court erred in failing to find that the City was immune from suit under § 13-910(1), (2), and/or (3) of the Political Subdivisions Tort Claims Act (Act). In actions brought pursuant to the Act, the findings of a trial court will not be disturbed on appeal unless they are clearly wrong.

*Desel v. City of Wood River*, 259 Neb. 1040, 614 N.W.2d 313 (2000).

Section 13-910(3) provides that the Act shall not apply to

[a]ny claim based upon the failure to make an inspection or making an inadequate or negligent inspection of any property other than property owned by or leased to such political subdivision to determine whether the property complies with or violates any statute, ordinance, rule, or regulation or contains a hazard to public health or safety unless the political subdivision had reasonable notice of such hazard or the failure to inspect or inadequate or negligent inspection constitutes a reckless disregard for public health or safety.

This language was added to § 13-910 by 1992 Neb. Laws, L.B. 262, and became effective on February 8, 1992. The City conducted inspections of the Mondelli home both prior and subsequent to this date. The Mondellis alleged that all inspections were performed with "reckless disregard." Reply brief and brief on cross-appeal for appellants at 13. Pursuant to the Restatement (Second) of Torts § 500, comment *b*. at 588-89 (1965), "[c]onduct cannot be in reckless disregard of the safety of others unless the act or omission is itself intended, notwithstanding that the actor knows of facts which would lead any reasonable man to realize the extreme risk to which it subjects the safety of others." See, also, *Dotzler v. Tuttle*, 234 Neb. 176, 449 N.W.2d 774 (1990).

Thus, the question of whether the City is immune from liability depends on whether the City had reasonable notice of any hazard or whether its failure to inspect or its inadequate or negligent inspection constituted a reckless disregard for public health or safety. The City inspector testified that he saw no evidence of leaking when he inspected the house after it was enclosed, nor was he told of any problems with water. There is nothing in the record to indicate that any City employee intentionally took any action without regard to whether it would subject another to extreme risk.

When the district court adopted statements made in our memorandum opinion as facts, it failed to consider evidence presented at the trial concerning those facts. The district court

erroneously found that the Code had incorporated by reference the 1983 edition of the CABO. On December 4, 1990, the City adopted an ordinance, Papillion Mun. Code, ch. 9, art. 4, § 9-401 (1990), which provided that the City adopted the UBC in addition to all amended editions. Section 103 of the UBC states that whenever reference is made to the appendix, provisions in the appendix shall not apply unless specifically adopted. The CABO is contained in § 1202 of the UBC appendix. The City ordinance adopting the UBC does not contain any language which specifically adopted any part of the appendix. Therefore, we agree with the City's assertion that the Code excluded all appendix sections. The Code did not adopt the UBC appendix and did not, therefore, adopt any of the CABO provisions. The district court erred in making this conclusion.

The district court also erred in accepting as part of the law of the case the proposition that the UBC and the CABO required builders to install tar paper over the sheathing that covers the frame before constructing exterior brick veneer on a house. Section 1707 of the UBC provides that all weather-exposed surfaces shall have a weather-resistant barrier to protect the interior wall covering, unless it is placed over water-repellent sheathing. There was expert testimony offered that the sheathing in the Mondelli house was "water-repellent panel sheathing," as the term is used in the UBC.

The Code also does not require that blueprints and construction design meet industry standards. It requires only that the plans comply with the Code, which incorporates the UBC. On Kendel's application for a building permit, the builder stated that it would comply with all requirements of the City's ordinances. There was no evidence presented to show that the blueprints or construction design did not conform to the Code and the UBC.

After completing an inspection, the building inspector is directed by § 9-103 of the Code to "either approve that portion of the construction as completed" or to notify the permit holder or his agent that the work fails to comply with the requirements of the Code. If no defects are found, the building inspector has no authority to halt construction. No evidence was presented that any of the defects in construction violated the UBC or the Code. Nor was there evidence that the City had notice of any

defects. The Mondellis did not prove that any violations of the Code were evident or that the City had notice of any violations.

The district court also found that the negligent acts of the City occurring after February 7, 1992, the date of the framing inspection, constituted a reckless disregard for public health and safety. The final inspection occurred on April 14. As noted, there was no evidence presented to show that any City employee acted intentionally to subject the public to extreme risk.

Therefore, we conclude that the district court erred in failing to find that the City was immune from liability. The City had no notice of any hazard, and no inspection or failure to inspect constituted a reckless disregard for public health or safety. All such claims against the City should have been dismissed pursuant to § 13-910. Therefore, the district court erred in imposing liability on the City.

### 3. KENDEL'S CROSS-APPEAL

Kendel asserts that the district court erred in imposing liability based on breach of warranty, strict liability, and/or negligence. The district court found that it was undisputed that the blueprints and construction design did not call for tar paper to be installed between the sheathing and brick veneer and that no tar paper was installed. It was also undisputed that the house plans did not call for weep holes or flashing, and none were installed. Although the source of the water infiltration was disputed, the parties did not dispute that the brick veneer front was identified as a possible source of water infiltration due to the excessive "bee holes," as well as cracks in the mortar, and that remedial action was recommended.

The district court found that the greater weight of the evidence established that the brick veneer front was not constructed in a workmanlike manner. The district court also concluded that the flashing between the roofline and the exterior of the wall of the house was not installed in a workmanlike manner. It found that installation of felt or tar paper was necessary to meet good usage and accepted practices of the construction trade in the community at the time the house was built.

In a bench trial of an action at law, the factual findings made by the trial court have the effect of a jury verdict and will

not be set aside unless they are clearly wrong. *Brandon v. County of Richardson*, 261 Neb. 636, 624 N.W.2d 604 (2001). The district court was not clearly wrong in finding that Kendel was negligent in building the house and therefore liable for breach of implied warranties and negligence. Because we reach this conclusion, it is not necessary for us to address any of the issues concerning strict liability.

## VI. CONCLUSION

With regard to the Mondellis' appeal, we conclude that the district court abused its discretion in excluding the testimony of Drs. Pour and King. This exclusion of evidence was prejudicial error. The district court did not abuse its discretion in refusing to allow joinder of the claims of the Mondelli family.

As to the cross-appeals of the City and Kendel, we conclude that the City should have been granted immunity from suit under the Act and that the City should be dismissed from the case. The district court was correct in determining that Kendel was negligent in the construction of the house and that Kendel breached its implied warranty that the house would be erected in a workmanlike manner.

For the reasons set forth herein, we reverse the judgment of the district court and remand the cause for a new trial on the issues of causation and damages.

REVERSED AND REMANDED FOR A NEW TRIAL
ON THE ISSUES OF CAUSATION AND DAMAGES.