WAYNE WAGNER, APPELLEE, V. UNION PACIFIC
RAILROAD COMPANY, APPELLANT.
642 N.W.2d 821

Filed March 26, 2002.   No. A-00-1020.

Steven W. Olsen, of Simmons, Olsen, Ediger, Selzer, Ferguson & Carney, P.C., for appellant.

Robert G. Pahlke of Van Steenberg, Chaloupka, Mullin, Holyoke, Pahlke, Smith, Snyder & Hofmeister, and Roger C. Denton, of Schlichter, Bogard & Denton, for appellee.

HANNON, SIEVERS, and MOORE, Judges.

MOORE, Judge.

## I. INTRODUCTION

Wayne Wagner filed suit in the district court for Scotts Bluff County against his employer, the Union Pacific Railroad Company (Railroad), seeking damages under the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51 et seq. (1994), and the Boiler Inspection Act (BIA), 49 U.S.C. § 20701 et seq. (1994), for injuries sustained in a work-related incident on March 1, 1998. After the trial court sustained Wagner's motion for summary judgment, finding that ice and snow on the walkway of a locomotive constituted a violation of the BIA, Wagner dismissed his cause of action based on the FELA. The case proceeded to trial on the issue of damages, and the jury returned a verdict in Wagner's favor in the amount of $1.9 million, which judgment was entered by the trial court. The district court subsequently overruled the Railroad's motion for new trial. For the reasons stated below, we affirm.

## II. BACKGROUND

Wagner filed an amended petition on December 17, 1998, against the Railroad claiming injuries to his neck, shoulders, arms, back, and legs sustained in a work-related incident on March 1, 1998. In count I of his petition, Wagner alleged, pursuant to the FELA, the negligence of the Railroad in failing to provide Wagner with a safe place to work, failing to inspect and maintain the walkway on the locomotive in question to ensure that it was safe and in good condition and free of ice and snow, and failing to provide safe and adequate walkways throughout the locomotive. In count II, Wagner alleged a violation of the BIA. Wagner specifically asserted that the Railroad violated the BIA by failing to provide safe and adequate walkways on the locomotive as required by 49 C.F.R. § 229.7(a) (1997), allowing ice and snow to exist on the walkways of the locomotive in question in violation of § 229.7(a), and failing to make the required daily inspection report as required by 49 C.F.R. § 229.21 (1997). In its answer to Wagner's amended petition, the Railroad asserted that the locomotive at issue was not "in use" and that the BIA did not apply. The Railroad further asserted the affirmative defenses of Wagner's contributory negligence and his failure to mitigate his damages.

Before trial, Wagner moved for summary judgment on the issue of liability pursuant to the BIA. Wagner asserted that it was undisputed that while in the course of his employment with the Railroad, he slipped and fell on an icy platform on a locomotive that was in service in the Bill, Wyoming, trainyard, sustaining some injury. Wagner's motion for summary judgment was submitted to the district court on the following evidence: the deposition of Wagner, the railroad mechanic's report of his inspection of the locomotive in question following Wagner's injury, an affidavit concerning the locomotive's condition from the same railroad mechanic, and an emergency room record concerning medical treatment of Wagner on the day of the incident.

In his deposition, Wagner testified that he has been a certified locomotive engineer since August 1974. On March 1, 1998, Wagner came on duty at 10:15 a.m. He was working with a conductor. Wagner and the conductor were called to take a train from Bill to the coal mine. Upon reporting for duty that day, the manager, Larry Anderson, gave them a list of instructions regarding some "switching" that was to be completed before they took the train to the mine. Wagner indicated that this was an unusual instruction as they did not usually perform switching in the Bill trainyard. Wagner described the Bill trainyard as "a place to park trains." Anderson instructed Wagner to put together a "consist" of locomotives so that a train could be run. (A consist is a makeup of like units.) The mechanic-in-charge (MIC) was going to accompany them and assist in hooking up air hoses and jumper cables. They were to build a consist for their train to go west and also had to "make some adjustment switching of power" for eastbound trains. Wagner was also instructed to hook up a specific engine to an eastbound train and configure the airbrake setup so that the train would be charged with air.

Wagner was on the job approximately 4 hours, switching around various locomotives, before he fell. The MIC was with Wagner and the conductor only for a brief portion of that time period. The final product of their activities that morning was a consist of three locomotives on track 6, which Wagner believed was the train with which they were to travel west. They also moved several locomotives to tracks 3 and 4, which Wagner believed were for eastbound loads. Wagner testified that the

locomotive on which he fell was on a loaded train set to head east, presumably on either track 3 or 4.

Wagner recalled that when he came on duty that morning, the weather was overcast, that it was approximately 30 degrees, that there was no wind to speak of, and that it was not snowing. Wagner believed that it had snowed in Bill sometime in the previous 24 hours; however, he did not know how long the storm had lasted or how much snow had fallen. Wagner was certain that there were not blizzard conditions in Bill when he was working on March 1, 1998. Wagner indicated that virtually all of the locomotives that they worked on that day were snowy and icy, having quite a bit of snow on their walkways and steps. Some of the locomotive doors were snowed shut, and he and the conductor had to brush the snow away with a broom to gain access. Wagner testified that he called the MIC for assistance in removing snow and ice, but was advised that no MIC's were available. At that time, Wagner did not inform the yard office of the buildup of ice and snow and did not specifically indicate why they needed the assistance of an MIC. Wagner indicated that the removal of ice and snow was a task which he would typically call an MIC to perform, but that he had on occasion shoveled, swept, or put down salt or sand to remedy icy or snowy conditions.

Wagner testified that he and the conductor entered the locomotive in question on March 1, 1998, at its front end. The steps where they entered the locomotive were covered with snow. Once inside the locomotive cab, Wagner attempted to configure the air-brake setup so as to charge the train with air. Wagner understood that the locomotive was part of a consist and was to be a lead-position locomotive. Wagner did not know, but assumed, that the locomotive was running; however, he was unable to tell whether the locomotive was running as he approached it because of the noise from locomotives running on other tracks. Wagner attempted for approximately 10 or 15 minutes to set up the air configuration, but was unable to obtain readings from the gauges to indicate that it was pumping air. Wagner was unable to determine from inside the cab whether the engine was running. He indicated that there were no alarm bells, that the unit switch appeared to be online and was "not isolated," and that the gauges were showing some air.

Because Wagner suspected that the unit was not running, he stepped out of the locomotive cab through the engineer's door behind the control panel to check the car body for vibration. Wagner had to kick the engineer's door open to exit the cab as it was blocked with snow. He walked three to four steps or 6 to 8 feet down the walkway and was unable to feel any vibrations. While doing so, Wagner held onto the "grab iron" with one hand, maintaining his other hand on the car body. At that time, Wagner became aware that there was snow and ice on the walkway and that the walkway was slippery. Wagner indicated that he observed the walkway to be covered in snow for its entire length. The buildup of snow varied in depth from 1 to 6 inches. Wagner also observed that the walkway was icy in spots. He indicated that the buildup of ice varied between 3 and 4 inches. Upon returning to the locomotive cab, Wagner informed the conductor that the engine was not running. Wagner indicated that they then unsuccessfully tried to start the locomotive from the cab.

Wagner testified that since Anderson had apparently believed that the unit was running, he felt it necessary to check to "make sure that the unit [was] drained" because it would "freeze up and break water pipes." Wagner then walked back out the engineer's door onto the walkway, attempting to reach the access panel where he would be able to see the sight glass and determine if there was water in the locomotive. While walking back toward the water gauge, Wagner again kept one hand on the grab iron and his other hand on the car body due to the icy conditions. After progressing along about half of the length of the car body, Wagner slipped and fell off the walkway, grabbed the grab iron with both hands, and was left suspended from the grab iron, facing away from the locomotive. He was able to turn himself around to face the engine, but did not have the strength to pull himself back onto the walkway. Wagner banged his right shin in the process of turning around. Wagner then let go of the grab iron, landing on his buttocks in the snow.

After composing himself, Wagner returned to the front of the locomotive, climbed inside the cab, and informed the conductor that he had fallen. Wagner showed the conductor his shin, which was "bumped and bruised and scraped and bleeding." Wagner indicated that they had basically completed the assigned task of

moving the various units around, so they proceeded to return to the yard office. Wagner informed Anderson that he had been hurt and showed Anderson his leg. Wagner indicated that in response to Anderson's inquiry as to whether Wagner wanted go to the hospital, Wagner responded that the injury did not appear "life threatening," so he would simply take himself off duty and return home. Wagner informed Anderson that his leg hurt, that he "hurt all over," and that he was "quite shook up."

Wagner drove himself home, and later that evening, he went to the emergency room at the local hospital. Wagner showed the emergency room staff his leg, informed them what had occurred, and told them that his shoulders, arms, leg, and back were sore. Wagner indicated that his leg was x rayed, that he was given a tetanus shot, and that he then drove himself home. Wagner testified that when he woke up the following morning, his neck, arms, shoulders, back, and leg were quite sore. Wagner then set up an appointment with his family doctor for treatment. The treatment and progression of Wagner's March 1, 1998, injuries, as well as the treatment of his preexisting degenerative back disease, discussed briefly in Wagner's deposition, were described by Wagner in great detail in his trial testimony and are discussed in further detail in the analysis portion of this opinion. Exhibit 12, the emergency room treatment records, was offered and received to show that Wagner received medical treatment on the day of the accident and that the accident caused some injury.

Exhibit 11, the Railroad's "Report of Inspection of Equipment Involved in Accident" received by the court, was signed by an MIC, James J. Allender. This report concerned Allender's inspection of locomotive number UP 8194 "in the use of which Wayne Wagner was Injured." The report indicated that the locomotive walkway was covered with ice approximately 1 to 4 inches thick, which was continuous along the length of the walkway.

The court also received exhibit 13, the affidavit of Allender. Allender stated that after Wagner's slip and fall, he was called to eliminate the ice and snow on the walkways of the locomotive in question. Allender indicated that the walkways were covered with snow and 1 to 4 inches of ice, which required a steel bar and shovel to remove. Allender asserted that there had been a severe blizzard that resulted in a buildup of ice and snow on the

locomotives. Allender indicated that when a crew discovers ice and snow that needs removal, he is called for that purpose, and that when he is unavailable, the crew usually waits for someone on the maintenance staff to remove ice and snow.

Allender stated that the locomotives run with just water and no antifreeze, so at temperatures below 35 degrees, it is necessary to have them running all of the time. Allender further stated that to determine whether a locomotive is running, one looks at the isolation switch, which should be in the online position, and that if the isolation switch is online, if no alarm bells are ringing, and if the computer display does not advise that the locomotive is shut down, one can assume that the engine is running. Before removing ice and snow from the walkways of the engine in question, Allender first checked to see that the engine was running and found that it was. Allender asserted that there was no reason for Wagner to go outside of the locomotive to check whether the locomotive was running, nor was there reason for Wagner to have to check the water gauge.

After a hearing wherein the district court heard arguments from the parties and received evidence as indicated above, the court granted Wagner's motion for summary judgment under the BIA on the issue of liability. The district court reasoned that to recover under the BIA, Wagner must establish by the greater weight of the evidence that the locomotive was "in use" at the time of his injury, that the Railroad violated the BIA, and that such violation was a cause, in whole or in part, of Wagner's injuries. The district court noted that under the BIA, Wagner did not have to prove that the Railroad was negligent, and that his contributory negligence, if any, would not diminish his right to recover damages.

With regard to the in-use question, the district court, relying on the reasoning set forth in *McGrath v. Consolidated Rail Corp.*, 136 F.3d 838 (1st Cir. 1998), concluded as a matter of law that the locomotive in question was in use at the time of Wagner's injury. The district court then considered whether there had been a violation of the BIA. The court noted that the questions of whether there was ice and snow on the walkway and whether such ice and snow was a cause of a railroad employee's injuries could be issues of fact to be determined by a jury. However, the court found that

the facts (1) that ice and snow had accumulated on the walkway and (2) that Wagner slipped on the icy walkway, incurring injury, were not disputed. Accordingly, the court found as a matter of law that the ice and snow on the walkway at issue constituted a violation of the BIA. Finally, the district court found that it did not have to determine whether the ice and snow on the walkway constituted an " 'unnecessary peril' " per se, because it had already found that the ice and snow on the walkway constituted a slipping hazard in violation of the BIA and its regulations.

Wagner thereafter filed a motion seeking to dismiss the negligence count of his amended petition without prejudice, which was granted by the court. The case was tried to the jury on July 12 through 14 and 17 and 18, 2000, on the issue of damages only.

At trial, Wagner presented evidence indicating that his principal injury related to his lower back, although he did receive minor injuries to his shin and shoulder. Wagner asserted that the March 1, 1998, incident resulted in a permanent low-back injury which precluded his return to work as a locomotive engineer. The Railroad, through its evidence, contended that Wagner's preexisting low-back condition was the source of his disability, contested the extent of Wagner's limitations, asserted that Wagner could return to work as a locomotive engineer with accommodations, and also claimed that Wagner failed to mitigate his damages by not cooperating with the Railroad's vocational rehabilitation expert. Wagner asserted that the Railroad's vocational rehabilitation offers were not made in good faith and that the Railroad had no genuine intent to allow him to return to work with accommodations. The relevant trial evidence is outlined more fully in the discussion section below.

Following the completion of Wagner's evidence, the district court denied the Railroad's motion for directed verdict and also denied Wagner's motion for directed verdict regarding the issue of mitigation at the close of all the evidence. The jury returned a verdict in favor of Wagner in the amount of $1.9 million, and judgment was entered accordingly.

The Railroad filed a motion for new trial on July 27, 2000. In its order entered August 29, the district court summarized the Railroad's assertions that the court had erred in (1) finding that the locomotive was in use and thus entering summary judgment

on the issue of liability and (2) making certain evidentiary rulings at trial related to vocational rehabilitation services. Additionally, the Railroad asserted that the judgment entered was excessive. The district court readopted its memorandum order dated September 16, 1999, wherein summary judgment was entered on the issue of liability pursuant to the BIA. The court again stated that Wagner's duties on March 1, 1998, were incidental to operating the locomotive as an engineer. The district court found that the verdict in the present case was not so disproportionate to the evidence presented that the court could disregard the jury's decision. The district court overruled the Railroad's motion for new trial, and the Railroad subsequently perfected its appeal to this court.

### III. ASSIGNMENTS OF ERROR

The Railroad asserts, restated and renumbered, that the district court erred in (1) sustaining Wagner's motion for summary judgment on the issue of liability under the BIA by (a) finding that the locomotive was in use at the time of the accident, (b) finding that ice and snow on the walkway of the locomotive constituted a violation of the BIA, and (c) finding liability under the BIA as a matter of law rather than allowing the jury to decide issues under the BIA; (2) not reversing the jury's verdict based on the fact that it was excessive and appeared to be given under the influence of passion or prejudice; (3) making evidentiary rulings that served to prejudice the Railroad, including allowing testimony as to the accommodation restrictions of employees other than Wagner; (4) refusing the Railroad's evidence as to offers of vocational assistance and jobs in locations other than in the Bill-Casper-Douglas, Wyoming area; (5) instructing the jury that Wagner was not required to move from his current home to minimize his damages; and (6) overruling the Railroad's motion for new trial.

### IV. ANALYSIS

#### 1. Summary Judgment as to Liability Under BIA

The Railroad asserts that the district court erred in sustaining Wagner's motion for summary judgment on the issue of liability under the BIA by (a) finding that the locomotive was in use at the time of the accident, (b) finding that ice and snow on the walkway of the locomotive constituted a violation of the BIA, and

12

(c) finding liability under the BIA as a matter of law rather than allowing the jury to decide issues under the BIA.

(a) Standard of Review

The BIA imposes " 'an absolute duty' " on railroad carriers to ensure that their locomotives are both properly maintained and safe to operate. *Matson v. Burlington Northern Santa Fe R.R.*, 240 F.3d 1233, 1235 (10th Cir. 2001). Because the BIA does not create an independent cause of action, such a claim must be brought under the FELA. *Id.*

Courts of the United States and courts of the several states have concurrent jurisdiction over claims controlled by the FELA. *Chapman v. Union Pacific Railroad*, 237 Neb. 617, 467 N.W.2d 388 (1991); *Crafton v. Union Pacific RR. Co.*, 7 Neb. App. 793, 585 N.W.2d 115 (1998). See 45 U.S.C. § 56. In disposing of a claim controlled by the FELA, a state court may use procedural rules applicable to civil actions in the state court unless otherwise directed by the act, but substantive issues concerning a claim under the FELA are determined by the provisions of the act and interpretative decisions of the federal courts construing the FELA. *Chapman, supra*; *Crafton, supra*; *Kusek v. Burlington Northern RR. Co.*, 4 Neb. App. 924, 552 N.W.2d 778 (1996). Unlike substantive issues, procedural matters are governed by the law of the forum. *Kirwan v. Chicago Title Ins. Co.*, 261 Neb. 609, 624 N.W.2d 644 (2001).

Whether a party is entitled to summary judgment is a matter of procedure generally controlled by the law of the forum. *Shilling v. Moore*, 249 Neb. 704, 545 N.W.2d 442 (1996); *Crafton, supra*. In Nebraska, summary judgment is proper only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Fontenelle Equip. v. Pattlen Enters.*, 262 Neb. 129, 629 N.W.2d 534 (2001).

On a motion for summary judgment, the question is not how a factual issue is to be decided, but whether any real issue of material fact exists. *Mondelli v. Kendel Homes Corp.*, 262 Neb. 263, 631 N.W.2d 846 (2001). In reviewing a summary judgment,

an appellate court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Fontenelle Equip., supra.* Where reasonable minds differ as to whether an inference supporting the ultimate conclusion can be drawn, summary judgment should not be granted. *Sherrets, Smith v. MJ Optical, Inc.,* 259 Neb. 424, 610 N.W.2d 413 (2000).

(b) Introduction to BIA

■■ "The BIA imposes upon railroads engaged in interstate commerce an absolute duty to utilize locomotives in a safe manner." *Rivera v. Union Pacific R. Co.,* 868 F. Supp. 294, 298 (D. Colo. 1994). However, "[a]bsolute liability under the [BIA] arise[s] only if the locomotive in question is 'in use.' " *McGrath v. Consolidated Rail Corp.,* 136 F.3d 838, 842 (1st Cir. 1998). The BIA, § 20701, provides:

A railroad carrier may *use or allow to be used* a locomotive or tender *on its railroad line* only when the locomotive or tender and its parts and appurtenances—

(1) are in proper condition and safe to operate without unnecessary danger of personal injury;

(2) have been inspected as required under this chapter and regulations prescribed by the Secretary of Transportation under this chapter; and

(3) can withstand every test prescribed by the Secretary under this chapter.

(Emphasis supplied.)

The BIA was formerly found at 45 U.S.C. § 23 (repealed by Pub. L. No. 103-272, § 7(b), 108 Stat. 1379 (1994)) and was transferred as amended to 49 U.S.C. § 20701 by Pub. L. No. 103-272 § 1(e), 108 Stat. 885 (1994). Although the BIA was recodified in 1994, the majority of the cases published to date discussing the BIA were decided before 1994, or while § 23 was still in effect, and thus discuss § 23 rather than § 20701. Section 23 was substantially similar to the current § 20701, although it used the language "unnecessary peril to life or limb" instead of "unnecessary danger of personal injury." "[I]t has been held consistently that the Boiler Inspection Act supplements the Federal Employers' Liability Act by imposing on interstate railroads 'an

14

absolute and continuing duty' to provide safe equipment." *Urie v. Thompson*, 337 U.S. 163, 188, 69 S. Ct. 1018, 93 L. Ed. 1282 (1949). See, also, *Lilly v. Grand Trunk R. Co.*, 317 U.S. 481, 63 S. Ct. 347, 87 L. Ed. 411 (1943); 49 U.S.C. § 20301 et seq. (1994 & Supp. V 1999) (current Federal Safety Appliance Act (FSAA)). "[R]ailroads whose employees are injured as a result of violations of the BIA will incur strict liability under the FELA." *McGinn v. Burlington Northern R. Co.*, 102 F.3d 295, 299 (7th Cir. 1996), citing *Vaillancourt v. Illinois Cent. R. Co.*, 791 F. Supp. 734 (N.D. Ill. 1992).

> The Supreme Court emphasized in *Lilly* that when a railroad violates the Boiler Inspection Act, "the partial defense of contributory negligence and the bar of assumption of risk are not available" to the railroad. . . . Thus, to recover under the Act, an injured railroad worker need only prove that a violation on the part of the railroad was a cause of his injury.

(Citations omitted.) *Topping v. CSX Transp., Inc.*, 1 F.3d 260, 261 (4th Cir. 1993).

The Railroad presented evidence in conjunction with the summary judgment hearing going to the issues of whether Wagner assumed the risk in walking on the snow- and ice-covered walkway and whether he was contributorily negligent in not taking further action to clear the walkway of the locomotive in question. As the affirmative defenses of contributory negligence and assumption of risk were not applicable in the present case, we find that any assertions by the Railroad in its brief on appeal suggesting that Wagner was contributorily negligent or assumed the risk involved in walking on the snow- and ice-covered walkway on March 1, 1998, are without merit.

### (c) Was Locomotive "In Use"?

We first consider the threshold question of whether the locomotive in question was in use within the meaning of the BIA at the time of Wagner's accident. As indicated above, although the BIA imposes absolute liability on railroads for violations of its provisions, such liability only attaches if the train is in use on the railroad's line at the time of the accident. See, *McGrath v. Consolidated Rail Corp.*, 136 F.3d 838 (1st Cir. 1998); *Crockett v. Long Island R.R.*, 65 F.3d 274 (2d Cir. 1995);

*Rivera v. Union Pacific R. Co.*, 868 F. Supp. 294 (D. Colo. 1994). Accordingly, if the locomotive in the present case was in use at the time of Wagner's accident, the BIA applies, and the Railroad can be held strictly liable for any injuries resulting from any violation of the BIA. Whether a locomotive is in use under the BIA is a question of law for the trial court to decide and not a question of fact for the jury. *Phillips v. CSX Transp., Inc.*, 190 F.3d 285 (4th Cir. 1999), *cert. denied* 529 U.S. 1004, 120 S. Ct. 1269, 146 L. Ed. 218 (2000); *McGrath, supra*; *Crockett, supra*; *Steer v. Burlington Northern, Inc.*, 720 F.2d 975 (8th Cir. 1983).

The purpose of the in-use limitation in the BIA and FSAA is to "exclude from . . . coverage only such functions as are necessary to detect and correct those defective conditions for which absolute liability will be imposed." *Angell v. Chesapeake & O. Ry. Co.*, 618 F.2d 260, 262 (4th Cir. 1980). " 'Congressional intent and the case law construing the statute clearly excludes those injuries directly resulting from the inspection, repair and servicing of railroad equipment located at a maintenance facility.' " *McGrath*, 136 F.3d at 842, quoting *Angell, supra*. See, also, *Phillips, supra* (observing that purpose of in-use limitation is to give railcar operators opportunity to inspect for and correct defects before being exposed to strict liability for such defects).

A locomotive may be considered in use even though it is motionless. See *McGrath, supra*. See, also, *Brady v. Terminal R.R. Assn.*, 303 U.S. 10, 58 S. Ct. 426, 82 L. Ed. 614 (1938); *Crockett, supra*. The primary factors considered by some federal courts in addressing the in-use question are (1) the location of the locomotive at the time of the injury and (2) the activity of the injured party. *McGrath, supra*, citing *Pinkham v. Maine Cent. R. Co.*, 874 F.2d 875 (1st Cir. 1989) (both interpreting BIA). See, also, *Phillips, supra*; *Deans v. CSX Transp., Inc.*, 152 F.3d 326 (4th Cir. 1998) (both interpreting FSAA and employing similar factors). Compare *Trinidad v. Southern Pacific Transp. Co.*, 949 F.2d 187 (5th Cir. 1991) (interpreting FSAA and employing bright-line test based on whether train is fully assembled and crew has completed predeparture inspection). Due to the fact-specific nature of this inquiry, we find it appropriate to apply the factors set forth in *McGrath* to the present case.

In *McGrath, supra*, the plaintiff incurred injuries when he stepped on a loose nut on the cabin floor of a locomotive, which was idling on a trainyard track within the confines of the defendant's trainyard. Trainyard tracks were identified as those tracks used to store, inspect, classify, and switch locomotives and railcars. The locomotive at issue was neither being serviced in a place of repair nor operating on the railroad's main line, but was scheduled that day to service the railroad's industrial customers in South Boston. McGrath was responsible for operating the train, and also for attaching individual railcars to the locomotive. McGrath was part of the transportation crew, but as engineer, he was also required to perform certain inspection duties before moving the locomotive.

The court in *McGrath v. Consolidated Rail Corp.*, 136 F.3d 838 (1st Cir. 1998), noted that the locomotive was not being stored on the trainyard track or awaiting removal to the engine house for repairs. The court concluded that as the locomotive in that case was idling on a trainyard track ready to move into service and as McGrath's inspection duties were incidental to his tasks of operating the locomotive as an engineer, the locomotive was in use for purposes of the BIA.

Also instructive is the Fourth Circuit's decision regarding whether an engine was in use in *Angell v. Chesapeake & O. Ry. Co.*, 618 F.2d 260 (4th Cir. 1980). In *Angell*, the employee's accident occurred after service and maintenance activities had already been performed and while a "readied" engine was being uncoupled at the direction of railway officials to move to another track to pull a train a few hours later. The Fourth Circuit found that the engine was not in need of further repair or servicing and was in reality "okayed" for service as contemplated by the BIA and that thus, the engine was in use when the accident occurred. The *Angell* court determined that a train could be considered in use even before the engineer took the controls. More recently, the Fourth Circuit considered *Deans, supra*. Deans, the injured conductor, and his engineer were assigned to take a particular train on the date of Deans' injury. Deans' tasks that day were to couple the engines to the railcars, release the railcars' handbrakes, and conduct a predeparture airbrake test. The railroad cars making up the train were already coupled

together when Deans arrived. When the accident occurred, the engine had been coupled to the train and was standing on a track in the trainyard in preparation for departure. The court noted that Deans, as the train's conductor, was part of its transportation crew and not involved in its repair or maintenance, that it was his job to put the train into motion, and that he was attempting to release the handbrakes to do so at the time of his injury. Accordingly, the *Deans* court held as a matter of law that the train was in use at the time of Deans' injury.

We also note the case of *Rivera v. Union Pacific R. Co.*, 868 F. Supp. 294 (D. Colo. 1994). In *Rivera*, the plaintiff, Rivera, was a locomotive engineer, who upon reporting for work was transported to his train located on a service track. The service department had completed its maintenance, repair, and servicing of the locomotive. The engine in question had left the servicing area, was attached to other railcars, and was idling. As a part of his routine duties, Rivera was to check the locomotives on the train to make sure that all of the handbrakes had been released and that the engines were in the "run" position. While engaged in this activity, Rivera slipped on an automatic brake valve handle left on the floor of a locomotive, receiving injuries. The court found that Rivera's "inspection" was not a comprehensive one designed to discover "defects" on the train, but was purely incidental to his task of operating the train as engineer. Compare *Paul v. Genesee & Wyoming Industries, Inc.*, 93 F. Supp. 2d 310 (W.D.N.Y. 2000) (holding railcar and train not in use where plaintiff not member of train crew, his inspection would not have been incidental to his operation of train, and no one at trainyard had started to join engines to train).

In the present case, Wagner was in the process of putting locomotives on trains being readied for departure from the Bill trainyard. The record does not indicate that the locomotive was being stored or awaiting removal to an engine house for repairs. At the time of his injury, Wagner was configuring the airbrake setup for an eastbound train, which is a step in the process of preparing the locomotive for departure. The task of moving the various units around to form the consists as directed by Anderson had been completed. Wagner was not engaged in the detection or correction of defects, activities excluded under the

BIA. Rather, his activities appear to be the type that are incidental to operation of a train as an engineer, although he apparently was not going to be the actual engineer on the locomotive in question. While Wagner determined that the locomotive was not running after checking the engine body for vibration, Allender indicated that when he subsequently went to remove ice and snow from the walkway of the locomotive, he found that it was running. In its reply brief, the Railroad asserts that once the locomotive was started and the brakes charged with air, a task Wagner did not complete, the actual engineer of that train would have to inspect the brakes and airhoses to ensure compliance with federal regulations and then complete a predeparture inspection. The Railroad further asserts that these inspections were never accomplished, since the locomotive was not running. These arguments go beyond what is presented to us in the record from the summary judgment hearing. An appellate brief generally may not expand the evidentiary record and should limit itself to arguments supported by the record. *Putnam v. Fortenberry*, 256 Neb. 266, 589 N.W.2d 838 (1999). Further, the evidence presented by the Railroad in Allender's affidavit suggests that the locomotive was found running subsequent to Wagner's accident.

With regard to the location of the locomotive, the record shows only that it was on tracks located in the Bill trainyard. There is no evidence to indicate that the locomotive on which Wagner was injured was located in a facility or on a track devoted primarily for maintenance, inspection, or repair activities. The record does reveal that the locomotive had been relocated to form part of a consist to pull an eastbound train which was loaded to head east at some unknown time in the future.

Whether the locomotive was in use at the time of Wagner's accident was a question of law to be determined by the trial court, and viewing the evidence with regard to the in-use question in a light most favorable to the Railroad as we must, we find that the trial court did not err in determining as a matter of law that the locomotive was in use at the time of Wagner's injury. Accordingly, the BIA applies to the case at hand, and the Railroad can be held strictly liable for any injuries incurred by Wagner resulting from a violation of the BIA.

### (d) Violation of BIA?

A rail carrier can violate the BIA either by breaching the broad duty to keep all parts and appurtenances of its locomotives in proper condition and safe to operate without unnecessary danger of personal injury, in violation of 49 U.S.C. § 20701, or by failing to comply with the regulations issued by the Federal Railroad Administration (FRA), which become a part of the BIA. *McGinn v. Burlington Northern R. Co.*, 102 F.3d 295 (7th Cir. 1996); *Mosco v. Baltimore & Ohio R.R.*, 817 F.2d 1088 (4th Cir. 1987), *cert. denied* 484 U.S. 851, 108 S. Ct. 152, 98 L. Ed. 2d 108.

The Railroad asserts that the existence of ice and snow on the locomotive in question did not constitute a defect under the BIA or any regulations promulgated thereunder, but this argument misconstrues existing case law and is without merit. In *Lilly v. Grand Trunk R. Co.*, 317 U.S. 481, 63 S. Ct. 347, 87 L. Ed. 411 (1943), the plaintiff was successful in maintaining an action under the BIA for injuries received from a fall caused by ice accumulating on the top of the locomotive tender on which he had to stand to perform his duties. On appeal, the rail carrier argued that the BIA covers only defects in construction or mechanical operation, affording no protection against "the presence of dangerous objects or foreign matter." *Id.* at 487. The U.S. Supreme Court upheld the judgment and held that the BIA requirement that locomotives be kept in proper and safe conditions was not confined to matters of construction or mechanics, but also extended to protection against foreign matter on the surface upon which employees must stand or walk.

In so finding, the Court relied in part on a federal regulation, which provided that the tender top should be kept clean and that means should be provided to carry off waste water. The Court noted that the BIA was to be liberally construed in light of its prime purpose, to protect employees by requiring the use of safe equipment, and concluded that the jury had a right to find a violation of the BIA due to the accumulation of ice on top of the locomotive tender even though there was no defect. See, also, *McGinn*, 102 F.3d at 300 (stating that "[t]he regulation [49 C.F.R. § 229.119(c) (1989)] also places strict liability on a railroad for failure to keep floors free of foreign

substances such as oil and grease or the elements such as snow and ice").

In *Calabritto v. New York, New Haven and Hartford R. Co.*, 287 F.2d 394 (2d Cir. 1961), *cert. denied* 366 U.S. 928, 81 S. Ct. 1649, 6 L. Ed. 2d 387, the plaintiff slipped and fell on sand and oil located on the platform of one of the rail carrier's switching engines. The rail carrier asserted that the BIA imposed liability "only for mechanical or structural defects, and not for dangerous conditions caused by the temporary presence of foreign matter." 287 F.2d at 395. The *Calabritto* court found that the statute had no such limitation, but, instead, required all locomotives to be in proper condition and safe to operate. The court, citing *Lilly*, determined that the use of an engine whose surface had been made slippery by sand and oil could similarly involve "unnecessary peril to life or limb" in violation of the BIA. The court concluded that *Lilly* must be read as holding that dangerous conditions caused by foreign substances may give rise to liability under the BIA even in the absence of a regulatory violation.

In *Whelan v. Penn Central Company*, 503 F.2d 886 (2d Cir. 1974), the court imposed liability under the BIA for a slip from an ice-coated step, resulting from a rain and sleet storm earlier that day. The rail carrier in that case argued that the BIA is not violated by slippery conditions caused by weather and that its failure to violate a specific federal regulation immunized it from liability. The appellate court, relying on *Lilly* and *Calabritto*, rejected these arguments and affirmed the judgment of the lower court.

Accordingly, contrary to the Railroad's assertions in its brief on appeal, conditions other than mechanical imperfections, including ice and snow, can plainly render equipment unsafe to operate without unnecessary peril to life or limb and have been found to violate the BIA both directly as well as through a rail carrier's noncompliance with federal regulations promulgated under the BIA.

### *(i) Violation by Noncompliance with Regulation*

We first consider whether the district court correctly determined that the Railroad, by violation of a federal regulation, had violated the BIA, thus incurring liability. A rail carrier who

violates an FRA regulation will incur liability under the BIA. *McGinn v. Burlington Northern R. Co.*, 102 F.3d 295 (7th Cir. 1996); *Mosco v. Baltimore & Ohio R.R.*, 817 F.2d 1088 (4th Cir. 1987), *cert. denied* 484 U.S. 851, 108 S. Ct. 152, 98 L. Ed. 2d 108. Although not one of the specific Code of Federal Regulations sections asserted in Wagner's amended petition, the district court relied on 49 C.F.R. § 229.119(c) (1997) to determine as a matter of law that the ice and snow on the walkway at issue created a slipping hazard and thus constituted a violation of the BIA. Section 229.119(c) states that "[f]loors of cabs, passageways, and compartments shall be kept free from oil, water, waste or any obstruction that creates a slipping, tripping or fire hazard. Floors shall be properly treated to provide secure footing."

In *McGinn, supra*, the court recognized that § 229.119(c) places strict liability on railroads for failure to keep floors free of foreign substances such as oil and grease or elements such as snow and ice. See, also, *Vaillancourt v. Illinois Cent. R. Co.*, 791 F. Supp. 734 (N.D. Ill. 1992) (determining that unsafe placement of ice chest on locomotive floor was properly characterized as obstruction that created slipping, tripping, or fire hazard in violation of § 229.119). In the instant case, the district court found that the facts that ice and snow had accumulated on the walkway, that the ice and snow made the walk slippery, and that Wagner slipped on the walkway and incurred injuries were not in dispute. In other words, the district court determined as a matter of law that the ice and snow on the locomotive walkway created a slipping hazard and was accordingly a violation of § 229.119(c), and thus of the BIA.

In asserting that this was a question for the jury, the Railroad relies primarily on *Gregory v. Missouri Pacific R. Co.*, 32 F.3d 160 (5th Cir. 1994). In *Gregory*, a locomotive engineer slipped and fell on oil that was on a locomotive walkway. On appeal, the rail carrier agreed with the plaintiff's assertions that violation of a regulation can be a violation of the BIA, but asserted that § 229.119(c) did not provide that the mere presence of oil on a walkway violated the BIA. The Fifth Circuit found that § 229.119(c) was not violated by the mere presence of any oil, water, or waste on a passageway, but, rather, was violated by the presence of such substances only if they created a slipping,

tripping, or fire hazard. There was a factual dispute as to the amount and location of the oil on the walkway and a dispute as to whether the condition was slippery. The plaintiff testified that he slipped in a large spot or puddle of oil, approximately 12 inches in diameter, and that the oil was wet and plainly visible. The rail carrier presented evidence that the oil did not look slippery, that it did not appear to be a slipping hazard, that the walkway had a nonskid surface, that there were no footprints in the oil or apparent marks of anybody slipping in it, and that relevant parties had not seen oil on the plaintiff's clothing following the accident. Because of this factual dispute, the court held that the question of whether the oil constituted a slipping hazard under § 229.119(c), and thus violated the BIA, was a question for the jury. *Id.* See, also, *Lakin v. Consolidated Rail Corp.*, 545 N.E.2d 843 (Ind. App. 1989) (finding jury question due to conflicting evidence as to whether placement of cable in question created tripping hazard in violation of § 229.119(c) and BIA).

The evidence in the present case, unlike that in *Gregory* and *Lakin* is undisputed. Wagner testified in his deposition that the locomotive walkway was covered with 6 inches of snow and patches of ice 4 inches thick and that when he went to check the sight glass, he slipped and fell on this covering of ice, incurring injuries to his neck, arms, shoulders, back, and leg. Allender's report and affidavit confirm that the walkways of the locomotive in question were covered with snow and 1 to 4 inches of ice, which required a steel bar and shovel to remove.

The evidence before the district court in the present case on Wagner's motion for summary judgment was such that reasonable minds could not conclude other than that the ice and snow created a slipping hazard. Accordingly, the district court correctly ruled as a matter of law that the ice and snow constituted a slipping hazard and thus violated the BIA.

### (ii) Direct Violation

With regard to the broader, more general duty of the Railroad under the BIA, the act currently requires railroad carriers to keep locomotives or tenders and their parts and appurtenances "in proper condition and safe to operate without unnecessary danger of personal injury." § 20701. The BIA previously

required carriers to keep any locomotive used on its line, its boiler, tender, and all parts and appurtenances "in proper condition and safe to operate . . . without unnecessary peril to life or limb." See 45 U.S.C. § 23 (1988). After determining that the Railroad had violated § 229.119(c), the district court found that it did not have to determine whether the ice and snow on the walkway constituted an "unnecessary [danger]" per se. In other words, the district court did not engage in an analysis of the more general duty imposed by the BIA. We find no error in the trial court's determination in this regard. The case law plainly provides that the BIA can be violated either directly or by means of a regulation. Accordingly, we do not discuss the arguments made by Wagner in his brief that consideration of "unnecessary peril" is no longer a requirement of the BIA, nor the assertion raised by the Railroad that the question of "unnecessary peril" was one for the jury. An appellate court is not obligated to engage in an analysis which is not needed to adjudicate the case and controversy before it. *King v. Crowell Memorial Home*, 261 Neb. 177, 622 N.W.2d 588 (2001).

### (e) Conclusion Regarding Summary Judgment

The summary judgment was appropriately granted in this instance. We find no error in the district court's determination that the locomotive was in use at the time of Wagner's accident and injury. Accordingly, the BIA is applicable to the case at hand. Viewing the evidence most favorably to the Railroad, we find no genuine dispute of material fact with regard to the question of whether the ice and snow on the walkway constituted a slipping hazard. Accordingly, we find no error in the district court's determination that the Railroad violated a regulation, and thus the BIA, and that therefore, the Railroad incurred strict liability for any damages suffered by Wagner as a result of his accident and injury.

### 2. EXCESSIVE VERDICT

The Railroad next asserts that the district court erred in not reversing the jury's verdict of $1.9 million based on the argument that it was excessive and appeared to be given under the influence of passion or prejudice. An award of damages may be set aside as excessive or inadequate when, and not unless, it is so excessive or inadequate as to be the result of passion, prejudice,

mistake, or some other means not apparent in the record. *Norman v. Ogallala Pub. Sch. Dist.*, 259 Neb. 184, 609 N.W.2d 338 (2000). If an award of damages shocks the conscience, it necessarily follows that the award was the result of passion, prejudice, mistake, or some other means not apparent in the record. *Id.* However, the amount of damages is a matter solely for the fact finder, whose action in this respect will not be disturbed on appeal if it is supported by evidence and bears a reasonable relationship to the elements of damages proved. *Nebraska Nutrients v. Shepherd*, 261 Neb. 723, 626 N.W.2d 472 (2001). On appeal, the fact finder's determination of damages is given great deference. *Norman, supra.*

Wagner sought damages for past and future medical expenses in excess of $5,000, past and future lost wages in excess of $36,000, decreased earning capacity, past and future pain and suffering, and a permanent, disabling injury. The jury was instructed on each of these elements of damages. The Railroad does not assign error to the giving of this instruction.

Wagner began his employment with the Railroad in February 1974, becoming a qualified locomotive engineer in August of that year. Wagner testified that prior to the March 1, 1998, incident, he was working full time as a locomotive engineer, was performing 100 percent of the job requirements without limitation, and was planning to work for the Railroad until he retired at age 65 or 66. Wagner was 47 years old at the time of the accident. Wagner has been unemployed since March 1, 1998.

Wagner suffered from back problems preexisting his March 1998 injury. Wagner injured his back in the late 1980's in a motor vehicle accident, subsequently had an L5-S1 laminectomy on his right side, and suffered various temporary aggravations of back pain in the intervening decade prior to his 1998 injury.

Dr. Robin Ockey, a specialist in physical medicine and rehabilitation, first saw Wagner in January 1999, primarily for low-back pain. Ockey reviewed an MRI scan and report from October 1998 as well as reports of MRI's and other studies conducted prior to Wagner's March 1998 injury. Upon comparing the current and the older studies, Ockey concluded that Wagner's disk protrusion had worsened since his injury in the late 1980's and that Wagner had sustained a new annular tear,

that is, a tear to the annulus, or outer fibers of the disk. Ockey also believed that there was a musculature component to Wagner's pain as well as a radicular component, or a nerve root problem. At trial, Ockey opined within a reasonable degree of medical certainty that both Wagner's "disc problem" and his "muscular pain" were caused by his fall in March 1998 and that Wagner was permanently disabled from his job as a locomotive engineer. Ockey further testified that Wagner would have ongoing pharmacological needs, intermittent physical therapy needs, and likely surgical needs. Ockey discussed various potential surgical options, including disk fusion and a procedure to repair the torn annular disk fiber. Ockey estimated the cost of that procedure at $10,000 to $20,000 and the cost of disk fusion surgery at $30,000 to $40,000.

Dr. Terry Himes, a board-certified neurologist, also opined that Wagner sustained an annular tear to the disk in his lower back as a direct consequence of his March 1998 injury. Himes testified that Wagner is at increased risk of further injury as a consequence of this annular tear and that Wagner now has structural instability in his lower back, which causes abnormal motion and devastating pain. Himes opined that as a direct consequence of the March 1998 injury, Wagner became totally incapable and functionally impaired from performing the duties of a locomotive engineer. Based upon the functional capacity evaluations, Himes found that Wagner was not magnifying any of his symptoms.

Evidence was presented about the wages and fringe benefits received by locomotive engineers employed by the Railroad in general and by Wagner specifically. Evidence admitted at trial indicated that the annual wages for engineers holding seniority positions similar to Wagner's ranged roughly between $63,000 and $90,000 in 1995, 1996, and 1997. The Railroad calculated Wagner's monthly average in the 6 months prior to his March 1998 accident to be $4,520.32. Wagner's wages in January and February 1998 averaged $7,000 per month, which, if multiplied by 12, equals an annual amount of $84,000. The Railroad further calculated that as of July 10, 2000, Wagner had lost $130,034.54 in wages from the time of his March 1998 accident. The total annual contribution by the Railroad to all employees for fringe benefits, including medical and dental coverage, and

retirement contributions, is $25,602 per employee. The most recent union contract provided for 3½-percent wage increases every other year and a 3½-percent cost-of-living lump sum in alternate years. There was evidence presented at trial indicating that Wagner may be employable in the computer field in the future, although such employment would require him to finish additional schooling and then secure a job. At the time of Wagner's deposition in April 1999, he had not taken any action toward embarking on such a career.

Wagner testified at trial that he still had pain in his back every day, that his activities were substantially curtailed by his injury, and that he was often irritable. Wagner's wife, who filed for divorce during the pendency of the present litigation, testified by deposition. She testified that prior to the incident, Wagner was doing well and exercising regularly, that the family used to go fishing and camping, but that Wagner had not participated in these or various family activities involving sitting for long periods since the March 1998 incident. She testified that Wagner suffered constant back pain and often had leg pain. Both Wagner and his wife indicated that his injury had negative effects on their marriage and played a role in their marital difficulties.

The Railroad argues that since Wagner's evidence and argument to the jury supported a loss of income and future earnings that amounted to approximately $1,120,000, the jury must have awarded Wagner $780,000 for pain and suffering, which the Railroad concludes is excessive. The Railroad refers in its brief to a series of factual disputes in the evidence, including whether Wagner injured his back in the March 1998 incident, whether Wagner was properly motivated to return to work, whether Wagner made genuine efforts to mitigate his damages, whether Wagner was malingering, and whether Wagner's preexisting back condition, rather than the March 1998 incident, is the cause of his current back problems. The Railroad then concludes, based upon the "extreme inconsistencies" within Wagner's testimony and the "fact that the jury awarded nearly $800,000 of pain and suffering," that the jury rendered its verdict for reasons other than the facts of the present case, such as a desire to "punish a large corporate business that had plenty of assets to satisfy an exorbitant award." Brief for appellant at 39. It should be

noted that the verdict of $1.9 million was a general verdict and was not divided into economic or noneconomic elements.

There is no mathematical formula for the translation of pain and suffering and permanent disability into terms of dollars and cents. *Schaefer v. McCreary*, 216 Neb. 739, 345 N.W.2d 821 (1984). It is a matter left largely to the discretion of the jury, which saw the witnesses and heard the evidence. *Id.* In the present case, the jury obviously accepted as credible Wagner's version of significant damages stemming from the March 1998 incident. We cannot say that the jury abused its discretion in awarding damages for Wagner's pain, suffering, and disability.

The Railroad also asserts that there is no indication that the jury reduced the award to its present value. The jury was in fact instructed in instruction No. 4 as follows:

> If you decide that [Wagner] is entitled to recover damages for any future losses, then you must reduce those damages to their present cash value. You must decide how much money must be given to [Wagner] today to compensate him fairly for those future losses. Bear in mind that your duty to discount to present cash value applies to loss of future earnings or future medical expenses only. If you should find that [Wagner] is entitled to damages for future pain and mental suffering, then such award is not subject to any reduction to present value.

Neither party presented expert testimony on present value reductions. Nor does the Railroad offer any proof to substantiate its claim that the jury failed to follow this instruction. This argument is without merit.

In conclusion, there was evidence that Wagner sustained $1.2 to $2 million in economic losses, chronic and devastating pain and suffering, permanent disability, and future medical expenses potentially exceeding $30,000. Wagner's damages were substantial and were supported by substantial evidence which the jury found to be credible. The damages award of $1.9 million is certainly a large sum, but we do not find it so excessive as to shock the conscience. The amount of damages awarded bears a reasonable relationship to the elements of damages proved in this case, and we will not disturb it on appeal.

### 3. VARIOUS EVIDENTIARY RULINGS

The Railroad asserts that the district court erred in making certain evidentiary rulings that served to prejudice the Railroad under Neb. Rev. Stat. § 27-403 (Reissue 1995). The Railroad argues that the cumulative effect of these rulings created significant unfair prejudice against it and that it was thus deprived of a fair trial based on Wagner's efforts to prejudice the jury.

#### (a) Standard of Review

We note that generally, the admissibility of evidence is a procedural matter governed by the law of the forum. *Crafton v. Union Pacific RR. Co.*, 7 Neb. App. 793, 585 N.W.2d 115 (1998). In Nebraska, to constitute reversible error in a civil case, the admission or exclusion of evidence must unfairly prejudice a substantial right of the litigant complaining about evidence admitted or excluded. *Rod Rehm, P.C. v. Tamarack Amer.*, 261 Neb. 520, 623 N.W.2d 690 (2001).

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make such discretion a factor in determining admissibility. *Genetti v. Caterpillar, Inc.*, 261 Neb. 98, 621 N.W.2d 529 (2001). Because the exercise of judicial discretion is implicit in determinations of relevancy and admissibility under Neb. Rev. Stat. § 27-401 (Reissue 1995), the trial court's decision will not be reversed absent an abuse of discretion. *Genetti, supra.* An abuse of discretion occurs when the trial judge's reasons or rulings are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

Section 27-403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." For purposes of applying § 27-403, probative value is a relative concept which involves a measurement of the degree to which the evidence persuades the trier of fact that the particular fact exists and the distance of the particular fact from the issues of the case.

*Seeber v. Howlette*, 255 Neb. 561, 586 N.W.2d 445 (1998). Unfair prejudice means an undue tendency to suggest a decision on an improper basis. *Id.*

### (b) Accommodation of Restrictions

The Railroad asserts that the district court erred in allowing testimony as to the accommodation of restrictions or lack of accommodation made to employees other than Wagner. During Wagner's rebuttal case, the trial court allowed Anderson, Wagner's manager, to testify as to the efforts toward accommodating his own restrictions and those of other employees made by the Railroad. Since the time of Wagner's accident, Anderson himself has suffered a work-related injury and has not worked since June 1999. Anderson testified that he is represented by Wagner's attorney in his own claims against the Railroad. Over the Railroad's objection, Anderson was allowed to testify as to the Railroad's treatment of his own claims following his accident and its treatment of the claims and restrictions of several other employees. Anderson's testimony suggested a refusal by the Railroad to accommodate his own restrictions and those of several other employees, but the Railroad conducted a thorough cross-examination, eliciting testimony from Anderson further explaining the circumstances of each of these employee's injuries and casting the Railroad in a more favorable light.

The Railroad asserts that Anderson's testimony was not relevant because as a manager for the Railroad, he had different job duties from those of Wagner as an engineer, his injuries and restrictions were different from Wagner's, and the Railroad's ability to accommodate those restrictions would be different from its ability with respect to Wagner. The Railroad further argues that Anderson's testimony with regard to other employees of the Railroad was not relevant to this case as there was no showing as to the similarity between the circumstances of those employees and Wagner's circumstances. Finally, the Railroad argues that Anderson's testimony was only produced to inflame the jury.

It seems that testimony regarding the Railroad's treatment of other injured employees in their own attempts to return to work, regardless of their positions and job duties, has some bearing on whether the Railroad's attempts, or lack thereof, to accommodate

Wagner's restrictions were reasonable. Upon our review of the record, we see nothing in Anderson's testimony to unfairly prejudice the Railroad by suggesting to the jury an improper basis on which to base its decision. We find no abuse of discretion in the district court's determination as to the relevancy and admissibility of Anderson's testimony regarding the Railroad's treatment of his requests for accommodation of restrictions following his work-related injury and the Railroad's treatment of requests by other employees.

(c) Vocational Rehabilitation Services in Other Cases

The Railroad asserts the district court erred in allowing testimony relating to the Railroad's failure to offer or provide vocational rehabilitation services to two other plaintiffs following their jury verdicts against the Railroad. The Railroad argues that allowing testimony about or references to these other cases was prejudicial to it, of no relevance, and only adduced to inflame the jury and create unfair prejudice.

Apparently, the Railroad is complaining of testimony elicited from its vocational rehabilitation specialist, John Janzen, during his cross-examination by Wagner's attorney. A review of Janzen's testimony reveals that he was allowed to testify on cross-examination, over the Railroad's relevancy objection, that in a previous lawsuit, he was asked at trial if he would be willing to provide rehabilitation services to the plaintiff, to which he essentially answered in the affirmative. Janzen also testified that he did not have any contact with yet another plaintiff following trial. Janzen was then asked, "[W]hatever you've done . . . after trial, the [R]ailroad doesn't pay for your services, is that true, in this area?" Janzen replied that that was a question that should be asked of a Railroad representative. On redirect, Janzen testified that he had been asked to provide rehabilitation services for two particular plaintiffs, that those individuals were not cooperative with his efforts to provide service, and that those individuals were represented by the same attorney representing Wagner at trial in the present case.

Testimony regarding the extent of services offered by Janzen in other cases has some bearing on whether Janzen's offer of rehabilitation services in the present case was genuine. We see

nothing in this testimony indicating what the outcomes of those other cases were, something that could have unfairly prejudiced the Railroad by suggesting to the jury an improper basis on which to base its decision, nor does the Railroad direct us to any place in the record where such testimony may be found. We find no abuse of discretion in the district court's determination as to the relevancy and admissibility of Janzen's testimony on cross-examination regarding his services offered in these other cases.

### (d) Mitigation of Damages

The Railroad next asserts that the district court erred in refusing the Railroad's evidence as to offers of vocational assistance and jobs in locations other than the Bill-Casper-Douglas area. Following the completion of Wagner's evidence, the district court overruled the Railroad's motion for directed verdict. Thereafter, Wagner filed a motion in limine seeking an order from the court precluding the Railroad from asking any questions or offering any evidence of any potential job openings for Wagner that may exist outside the Bill-Casper-Douglas area. Wagner asserted that the law on mitigation precluded any evidence concerning jobs that would require him to move from his area of residence. Wagner asserted that the Railroad should be limited to showing job openings in Wagner's geographical area, citing *Wilson v. Union Pacific R. Co.*, 56 F.3d 1226 (10th Cir. 1995), and *Coleman v. City of Omaha*, 714 F.2d 804 (8th Cir. 1983). This motion was sustained by the district court. Upon the completion of all the evidence, the district court denied Wagner's motion for directed verdict regarding the issue of mitigation. Jury instructions contained in the record indicate that, among other things, the jury was instructed that while Wagner was required to take reasonable steps to minimize his damages, he was not required to move from his current home in the Bill-Casper-Douglas area to minimize or reduce his damages.

In *Coleman, supra*, an age discrimination case, the plaintiff was a deputy police chief employed by the city. The Eighth Circuit considered, among other issues on appeal, whether the city had met its burden with respect to proving the plaintiff's failure to mitigate damages. The court stated that the defendant had to "show that the plaintiff failed to use reasonable care and

diligence and that there were jobs available which the plaintiff could have discovered and for which the plaintiff was qualified." 714 F.2d at 808. The court noted the plaintiff's testimony that he had not sought alternative employment, as well as the city's evidence that several jobs for which the plaintiff was qualified were available, including positions as police chief in two small Nebraska towns and a vice-presidency with an Omaha private security firm. The court found that the evidence presented with regard to the two police chief positions was inadequate to meet the city's burden. The court stated that "[b]oth jobs would have required that [the plaintiff] leave Omaha, his home for most of his life. [The plaintiff] cannot be required to move from his home 'in order to reduce damages caused by the [defendant's] unlawful acts.'" *Id.* After considering the evidence presented with regard to the Omaha position, the court concluded that the evidence was sufficient to present the question of mitigation to the jury. See, also, *Wilson, supra* (FELA case citing *Coleman, supra*, with approval in conjunction with its holding that plaintiff's general failure to seek employment for 18 months before trial did not alone justify mitigation instruction because defendant must also show that appropriate jobs were available).

In the present case, the record shows that while Wagner was a party to a pending divorce, his wife and minor children lived in Douglas, and that Wagner maintained a regular relationship with his children. The record shows that Wagner had moved to Wyoming originally from Chicago and was perhaps contemplating returning to Chicago; however, there is nothing definite about this in the record. Regardless of whether Wagner was contemplating such a move, we can find no error in the district court's ruling limiting the evidence in regard to the availability of jobs, either with the Railroad or elsewhere, to those jobs in the Bill-Casper-Douglas area.

The Railroad argues that it should have been allowed to adduce evidence as to information about available jobs that was provided by Janzen and the lack of any response by Wagner. Contrary to the Railroad's assertion, and somewhat at odds with the above ruling by the district court, our review of the record leads us to conclude that the Railroad was in actuality allowed to adduce such evidence. The Railroad produced evidence showing that it had

communicated to Wagner numerous job openings in various locations. Janzen was allowed to testify that upon being hired by the Railroad to provide vocational rehabilitation services to Wagner, Janzen sent Wagner a letter indicating a willingness to meet with him and provide rehabilitation services, and that he received no response from Wagner. Janzen was allowed to testify about 13 letters that he sent to Wagner concerning job openings at various locations, which letters were also received into evidence over Wagner's numerous relevance objections. The record also clearly shows that the Railroad was allowed to show the jury that Wagner did not respond to any of these letters. Accordingly, to the extent that Janzen's testimony was limited by the trial court's ruling on Wagner's motion in limine, we find no abuse of discretion by the trial court or unfair prejudice to the Railroad.

### (e) Conclusion Regarding Evidentiary Rulings

We find nothing in the above evidentiary rulings to unfairly prejudice the Railroad. The district court did not abuse its discretion in making the rulings complained of by the Railroad, as the evidence either was relevant and properly admitted or was properly excluded based on a valid interpretation of current case law. The Railroad's assignment of error is without merit.

### 4. JURY INSTRUCTION

The Railroad asserts that the district court erred in instructing the jury that Wagner was not required to move from his current home to minimize his damages. Whether a jury instruction given by a trial court is correct is a question of law. *Nebraska Nutrients v. Shepherd*, 261 Neb. 723, 626 N.W.2d 472 (2001). When reviewing questions of law, an appellate court has an obligation to resolve the question independently of the conclusion reached by the trial court. *Id.* In an appeal based on a claim of an erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant. *Id.*

As indicated above, the district court denied Wagner's motion for directed verdict regarding the issue of mitigation. The jury instruction No. 4 states in part as follows:

> If you assess damages, then you must consider the [Railroad's] claim that [Wagner] failed to take reasonable

steps to minimize his damages. The [Railroad] is not liable for any damages that could have been prevented if [Wagner] had done so. The [Railroad] has the burden of proving that [Wagner] failed to take reasonable steps to minimize his damages. However, [Wagner] is not required to move from his current home (Bill-Douglas-Casper, Wyoming area) to minimize or reduce his damages caused by the accident alleged.

We note that the Railroad failed to make any objection to this instruction at the time of the instruction conference in this case and failed to tender an alternative instruction on the subject. Failure to object to a jury instruction after it has been submitted to counsel for review precludes raising an objection on appeal absent plain error. *Maxwell v. Montey*, 262 Neb. 160, 631 N.W.2d 455 (2001). Nonetheless, based on our review above, we conclude that the district court did not err in giving the instruction complained of in the present case as it correctly stated the law with respect to Wagner's duty to mitigate, was not misleading, and adequately covered the issues. See *id.* (holding that jury instruction is not error if, taken as whole, it correctly states law, is not misleading, and adequately covers issues).

### 5. MOTION FOR NEW TRIAL

Finally, the Railroad asserts that the district court erred in overruling the Railroad's motion for new trial. The Railroad assigns this as error, but does not argue it specifically in its brief. In order to be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error. *Mondelli v. Kendel Homes Corp.*, 262 Neb. 263, 631 N.W.2d 846 (2001). However, we take all the arguments made by the Railroad on the above issues to relate to its desire for a new trial.

A motion for new trial is addressed to the discretion of the trial court, whose decision will be upheld in the absence of an abuse of that discretion. *Holmes v. Crossroads Joint Venture*, 262 Neb. 98, 629 N.W.2d 511 (2001). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.* A motion

for new trial is to be granted only when error prejudicial to the rights of the unsuccessful party has occurred. *Rod Rehm, P.C. v. Tamarack Amer.*, 261 Neb. 520, 623 N.W.2d 690 (2001).

Given our rulings as indicated above on the Railroad's other assignments of error, we cannot say that the district court abused its discretion in denying the Railroad's motion for new trial.

## V. CONCLUSION

For the above-stated reasons, we find that the district court did not err in granting Wagner's motion for summary judgment on the issue of the Railroad's liability under the BIA, nor did the district court abuse its discretion in denying the Railroad's motion for new trial.

The amount of damages awarded in this case, while certainly high, bears a reasonable relationship to the elements of damages proved, and we will not disturb the award on appeal.

The district court did not abuse its discretion in making the evidentiary rulings complained of by the Railroad, as the evidence either was relevant and properly admitted or was properly excluded based on the district court's valid interpretation of current case law.

Finally, we conclude that the district court did not err in giving the jury instruction complained of in the present case, as it correctly stated the law with respect to Wagner's duty to mitigate, was not misleading, and adequately covered the issues.

AFFIRMED.